Ben Coleman for Appellant Ian Diaz. My plan was to start with the lead issue in the brief regarding the intent requirement for the stalking statute and then if I have time to address the 1519 count. Beginning with that lead issue, it's essentially our position that this court should follow the analysis of the Third Circuit in its 2022 opinion in Young. And I think that that opinion was quite clairvoyant because the Third Circuit's mode of analysis was essentially endorsed by the U.S. Supreme Court the following year in 2023 in two cases, Hansen and Counterman. Now, so let me let me ask you this. As you know, Young is a Third Circuit case. And with all due respect to the Third Circuit, Ossinger is our case. And I wrote it. There you go. There you go. And that preceded Young by what, like six years or more, eight years. Why are we not bound by Ossinger? Why would we be looking to Young in this case? But I mean, when I saw that this calendar was at 930, I had a feeling Judge Rawlinson was on the panel that she wrote Ossinger. Look, I think you're absolutely correct in Ossinger. The statute is not unconstitutionally vague. That that was the issue that was raised in Ossinger was was the statute facially unconstitutional. And Judge Rawlinson was absolutely right. It's not. The question in this case is, what do the intent? What does the intent requirement mean? The intent to intimidate or harass? And that is not an issue that Judge Rawlinson or the panel addressed in Ossinger. Of course, we also have, you know, a good 15 years or so, you know, or 10 to 15 years water under the bridge with a lot of cases that have come out since then, like Young. Why do you think that those are not just everyday terms that any reasonable juror or juror would understand? Well, I think that Young and Hanson itself make that clear that in order if you an ordinary person, if you use the word intimidate, for example, they can think of it in a lot of different ways, not just an intent to instill fear of violence, of physical injury or death. I mean, you could say I was intimidated by the intellect of the judges on the panel and their harsh questioning. I mean, that that's you can be intimidated in a lot of different ways. I felt financially intimidated or whatever it may be. But intimidate in this context, and I think this is what Hanson makes clear is you have to still hoping for the lawyer someday who feels intimidated by my questions. But in 29 years of the bench, I've never encountered that lawyer. That's not what I've heard. You know, I think that you can easily see intimidating being used in a lot of different ways. And in a lot of the opinions, Young, the a circuit case, Srinirowski, they make that clear that if you look at words like intimidate, intimidate and harass in an ordinary broad sense, they're overbroad. We need to look at the stat. We need to look at those words narrowly. And we're asking, is that right? In Dubin, the Supreme Court in 23 talked about that. We we look at words in a particular context that's being used. And I'm just not persuaded that intimidate in this context is all I difficult to understand. It's pretty straightforward, is it not? Well, I do agree the context. And I think Dubin talks about the title of the statute. Right. And here, the title of the statute is stalking. And what that is getting at is violence or fear of violence, creating fear of violence, creating fear that you may be injured. And we can talk about harass in a second. But for intimidation, the context itself makes it clear, given this the stalking title of the statute, that we're that it's focused at violence and fear of violence. And so I think the context. And then, of course, you've got the background First Amendment principles of countermen, that these stalking statutes and what was at issue in countermen was Colorado's stalking statute, that they have to be read in the context of true threats, jurisprudence and true threat. Jurisprudence requires an intent to instill fear of bodily harm or death that type of counsel. Why do they have to be read in the context of true threats? Jurisprudence? Well, I think that that case says that the elements of the stalking statute must be read in the context of true threats. Precedent. I think both countermen and young take that approach that that that you that when you're looking at a stalking statute, that's the Supreme Court, what they looked at as the First Amendment exception that applied to that stalking statute was true threats. That was the context that are the exception that the Supreme Court analyzed it all. But we don't have just true threats jurisprudence. We have the title of the statute. This court also in we cited a case called self and for many years in other federal criminal statutes that use the word intimidate to find it the exact same way that the Third Circuit did in young, which is an intent to instill fear of bodily injury or death. And frankly, I don't in the government's brief, I don't even see them really attacking the young definition. Maybe we'll hear something differently today. But they haven't really gone after the young definition as being correct. You help me with this. This obviously is a very troubling case. And your client had occupied a position of real prominence as a marshal, understood the system very well. What role if any, in our analysis of context, should we, if you will, what, how should we view your clients background, in our understanding of the context of the statute, if at all? Well, look, I acknowledge that, you know, these are very serious, you know, charges, you know, the conduct that's alleged is very serious. No one's walking away from that. And I'm not arguing that the conduct that's alleged is not criminal. It is criminal. There are lots of statutes, state statutes and other statutes that prohibit this alleged conduct. But the question here is, did he engage in stalking? Did he violate the federal stalking statute? And the government just charged the wrong statute. He did not stalk the victim. And his background as a marshal, I don't think affects that. The statute has to be read consistently. You don't look at the facts of the case and change. And we cited lots of these cases in the reply brief. You don't look at the statute and interpret it differently, depending on the defendant. Let me, what I'm trying to understand is this. Let's just say your client was presumably, as a marshal, familiar with these statutes, was familiar with the intent required. He seemed, if the allegations are correct, he seemed to have very carefully blotted out a lot of close, if you will, serious crimes. What role does this play? I mean, the idea that what he was doing, if alleged, if the allegations are correct, was not intimidating is farcical to me. I don't understand where you can get there. Well, I don't think that he intended, or did the government present any evidence that the victim said that she felt fear for her, that she was going to suffer bodily injury or death. He intended to frame her. That was the allegation in the indictment, that he intended to frame her. Not that he intended for her to fear physical injury or death. And that's what the statute that they charged made as that requirement. And again, the conduct is criminal. It's just not a violation of the stalking statute. It's not stalking. Counsel, is it your, do you argue that the conduct of this case implicated your client's First Amendment rights? No, we're not making a First Amendment challenge. Okay, so why do you think that countermeasure applies? Because that was in the First Amendment context. And that's why the true threats jurisprudence was included in that case. So why would countermeasure apply if the First Amendment rights are not an issue in this case? Yeah, our claim is a statutory construction claim in that the statute has to be read. There are lots of reasons to read the statute narrowly, as we've suggested. One is the title of the statute. One is the no-sitter principle or the principle that words are, you know, read in context of the other words in the statute. There are all these reasons. And one of the statutory construction claims that we have is constitutional doubt. That you have to read the statute narrowly so that the statute is not rendered potentially in violation of the First Amendment. But there is no, that's, that's why I asked you that question. There is no First Amendment implication. There's no First Amendment implication here because we're not talking about speech. We're talking about conduct. And that's why I'm not necessarily persuaded that countermeasure helps you because this is not a true threats case. Right. Well, let's go back to Young, the Third Circuit's analysis. Well, but okay. But Young is not binding on this. Counterman, we would have to follow if it, if it met the facts of this case. So I'm just interested in Counterman right now and why that is not persuasive in terms of how we decide this case. So do you agree that Counterman is factually and legally distinguishable from the facts of this case? Well, I think it's factually distinguishable. I mean, but what I think the principle of countermeasure... It's legally distinguishable if the First Amendment is not implicated. Well, I think what Counterman says, why I don't think it's legally distinguishable is Counterman says that stalking statutes, Counterman interpreted a stalking statute. But it was a true threat. It was a First Amendment true threat stalking case, which is different than this case, which is a conduct stalking case. Well, the, I mean, I think that the arguably the, the government in Counterman would have argued that it was conduct. It wasn't, it wasn't just true threats, that it was also conduct. I think the point of Counterman is that stalking statutes, if they're going to comply with the First Amendment, they have to have a subjective intent requirement to engage in a true threat or to instill fear of violence. That's what Counterman holds that when you... Trevor, yeah, I wanted to go back in that regard to you, you said you were going to offer some thoughts about Harris, as opposed to intimidate. What did you want to say about Harris? Right. On Harris, I mean, the Third Circuit interprets, you know, harass and intimidate very similarly. And it seems to also indicate that there needs to be some form of an intent to instill fear of some form of violence. Our position is that we think that's absolutely correct. But if the court thinks that there needs to be at least some, you can't have the words meaning the exact same thing, because we presume that Congress, we, you know, would not use the words exactly in the same manner, that it can include sexual harassment, because that's akin to, that's what most people think of in the, when they think of harass, particularly in a narrow manner. And that's akin to the violence that the statute is designed to attack or to prohibit. Well, so aren't you saying, aren't you admitting that the statute then, even as contemplated, did not apply just to violence? Well, I think it's debatable whether, you know, the Supreme Court hasn't said that sexual harassment would comply with a statute. But I think it has a much better chance, if you read the word in that manner, it has a much better chance of satisfying countermen, that sexual harassment is similar to violence. It's, you know, it's unwanted sexual advances that, you know, cause people to fear for their, you know, personal safety. You don't think there could be unwanted sexual advances that would be achieved through intimidation? Well, non-violent intimidation? Well, in an ordinary sense, you may be able to do that. I don't think that's what the statute contemplates. I think the statute... Why, why, why, what's your, is there anything in the legislative history that shows, that says that? No, I don't think the government has relied on the legislative history at all, either. I mean, the, I think the Supreme Court has sort of walked away a little bit from legislative history. But I think the title of the statute, stalking, stalking, stalking, stalking, that, you know, I come back to, this is a statute that targets stalking. Isn't there, isn't there a bunch of cases out there that say that the title of a statute is a very weak basis for interpreting a statute? Well, to the extent that they're out there, they've been overruled by Dubin. I mean, Dubin in 2023, that was the, probably the lead rationale for the Supreme Court's interpretation was the title of the statute. I assume I've got about a minute left. I did want to get to the 1519 count, but I guess I'll just save that minute for rebuttal. All right. Thank you, counsel. Thank you. We'll hear from the government. Good morning, your honors. Paul Crane on behalf of the United States. And unless the court would prefer otherwise, I'll also start with the mens rea for the section 2261A offense. And where I'd like to begin is, is emphasizing Judge Rawlinson's point that this statute is targeting conduct, not speech. That was a point emphasized in the Ozinger opinion. That is one of the main reasons. It puts it outside the true threat counterman type context. Footnote four of the Ozinger opinion also makes that clear that because the statute is targeting conduct, not speech, it doesn't have to meet the true threat definition. And we think Ozinger, even though it was primarily addressing vagueness, it also addressed First Amendment concerns and did an as applied First Amendment analysis. And we think it's discussion there about the plain and ordinary meanings of the terms and for harass, for example, is still good law in this circuit. With respect to Young, the government, you know, does not think Young is correct. Now, we're outside the Third Circuit, so obviously it's not binding. But the key error that the Young court made is, and this is on page 77 on the 37th federal quarter of that opinion, is the Young court says that this is about target, rejects the notion that it's targeting conduct and not speech. And then when it goes down that path, when it's talking about the intent that's required, it loses sight that this intent to intimidate or intent to harass is about the requisite mens rea, not the requisite actus reus or harm that must be caused under the statute. The analysis there looks much more akin to treating the statute as if it was a harassment statute or an intimidation statute, as opposed to was it done with the intent to intimidate or intent to harass. And every other court of appeals, including this court in Ozinger, we think properly analyzed it along that way. And as my friend on our side said, there is no sort of direct First Amendment argument here. If there were legitimate First Amendment concerns, as the court in Ozinger did, and as most other courts of appeals have done, that can be addressed through as applied challenges, as opposed to taking this artificially constitutional avoidance narrow approach that the Third Circuit felt it needed to do in Young. If there aren't any other additional questions about Young or Counterman, one sort of additional point that I would like to make sure to emphasize is that this statute has several additional requirements beyond just the requisite criminal intent of harass and intimidation, most notably, that the use of the interstate facility has to do with the intent to harass. Interstate commerce facility has to be used to engage in a course of conduct, which, as the statute defines, is a pattern of conduct, composing of two or more acts, evidencing a continuity of purpose. And it must cause what was specifically alleged in this case, substantial emotional distress. So some of the most sort of potentially problematic hypotheticals, I think, could be dealt with both by recognizing what the statute requires, which is, I think, a fairly significant requirement, which the jury found here, and the requisite criminal intent of intent to intimidate or intent to harass. I'm happy to address any other questions the panel might have about the obstruction of justice or perjury count. On the obstruction of justice, it wasn't totally clear to me what the government's affirmative evidence of intent was on that count. Yes, Your Honor. I'm sorry, I didn't mean to interrupt you. No, go ahead. So with respect to the affirmative evidence about there being an intent to impede or influence, the main defense at trial was twofold, which is slightly different than the defense presented on appeal. First, Mr. Diaz said that he was not aware that there was this internal investigation through the U.S. Marshal Service. The affirmative evidence at trial that we proved and that the jury must have found is that he was aware, including by reaching out to—he learned about the investigation from one of the local Anaheim Police Department detectives, and then he reached out to the U.S. Marshal Service internal investigator trying to gather more information and reached a dead end. And so that was the primary evidence indicating that he was aware of this U.S. Marshal's internal investigation. The other main defense is saying, what he said at trial, at least, was that he wasn't trying to obstruct when he was doing this, but rather he was just sort of cleaning up his email systems and he wanted to maintain his privacy. And by that point in time, when he deleted his personal email account in December, the suspicion had started to move away from the victim, Michelle, and more to him and his co-conspirator, Ms. Connell. My question really is—that's why I phrased it in terms of affirmative evidence. I understand the answers you gave to his defenses, but of course the government bears the burden. And what was the—is it all—it may be all circumstantial. That's sufficient. But I just wondered whether there's any more—anything more explicit on the issue of intent other than just the, if you will, the awareness and the timing, which is what I take it the government is primarily relying on. I think that's fair, Your Honor. And I don't—I think it was almost—I think there was lots of circumstantial evidence, including his acts of concealment beyond just deleting this personal email account, which was also presented to the jury, of deleting other pieces of data, and later on the perjury itself. I think there's a long track record of trying to conceal his behavior. But then I think then the jury, especially on a sufficiency of the evidence review, a rational jury could determine that there was the requisite criminal intent based on all of that circumstantial evidence. Okay. Did that answer your question, Your Honor? Yes. If there's other questions about the obstruction count or the perjury count, the government's happy to rest on its briefing and submits that the judgment should be affirmed in full. All right. Thank you, counsel. Thank you, Your Honors. On the obstruction count, and then I'll try to loop back to the stalking charge. The government's own evidence was that the local detective executed a search warrant on the email account—that's the subject of the obstruction count—and mailed a notice of the execution of that warrant to Mr. Diaz months before he closed the account. So Mr. Diaz, as far as his intent, he knew that they had already executed a search warrant on the email account. And that detective testified and did not dispute any of that evidence. So he could not possibly have had the intent to obstruct justice when he knew that they already had executed a search warrant on the account. They can't even prove any obstruction because they executed a warrant on the account and got the emails. The local detective got them, and he handed all his information over to the federal investigators. Is that in the record that the local law enforcement got the records and handed them over? Where is that in the record? Yes. When the local detective testified—and we cited it in the brief, I don't have the exact ER site, but it's in the brief—he testified that he handed everything over to the marshals. But everything—that's not specific as to whether it was these specific records that were being sought, and whether they were up to the date that was being sought in the subpoena. Well, the government didn't show that—I mean, it's their burden of proof, and they didn't offer any evidence. Well, they proved that he deleted the account. But— He closed it. He closed the account. I thought it said, well, closed. I thought it said deleted. I can't remember. But anyway, so the counter to that was law enforcement—local law enforcement gave them the same information, right? Correct. But that's not really verified in the record, though. Well, it is. This is the government's evidence. They introduced Mr. Diaz's deposition. In his deposition, he said the detective, Detective Cunha, executed a search warrant on the North of Lights End Gmail account, that he received confirmation of that in the mail that he executed the warrant on that account. Then Detective Cunha testified. He testified that he executed warrants on the Gmail accounts, and he never disputed that he didn't execute a warrant on that account. Okay. The jury heard all of this evidence, right? The jury heard all of this evidence and convicted your client. Right. And it was insufficient. The evidence was insufficient. Maybe I'm misunderstanding the facts here. The special agent testified that the government executed a search warrant for the account, but did not get any emails back because the account had been deleted. Detective Cunha also testified that the government had attempted to execute a search warrant for the account, and got subscriber information back, but no emails because the account had been deleted. So, why is it a reasonable inference that whatever may have happened before that, when he made the decision, when your client made the decision to delete, it was to prevent the government from getting further access to the emails in that account? Well, Your Honor, I think you had misstated the testimony a little bit. Detective, it was the federal agent who said that he tried to execute a search warrant at some other time. He didn't even introduce whether it was five years ago. But it was deleted, not closed. So, the special agent that we're talking about testified that the government executed a search warrant for the account, and quote, did not get any emails back because the account had been deleted. That's at volume five of the record at page 856. Detective Cunha similarly confirmed that the government had attempted to execute a search warrant for the account, and quote, got subscriber information back, but no emails because the account had been deleted, close quote. That's at seven, volume seven of the record at page 1505. So, what did you think I misstated? Okay, well, I'll take a look at seven, 1505. My recollection, and the government didn't argue this in their brief, was that Cunha said that he had executed warrants on Gmail accounts. He never said anything that I only got subscriber information back on the North of Lights End. The government never pointed that out in the brief. And I'll look at the 7ER again, the site that you mentioned. But that was never raised in the brief. I've never seen that. And Mr. Diaz testified in his deposition that they did execute the warrant on the account. He got the confirmation of that, and Cunha never disputed that. But I'll take a look at 7ER again. Well, the record is the record. It was presented to the jury. So, the issue is whether or not this evidence was sufficient to sustain the jury's verdict. So, whatever it is, whether you agree with it or not, it's the record. No, correct. But, you know, Katakis, that was a case, that was a sufficiency of the evidence case. If they didn't show actual obstruction, then they can, then there's insufficient evidence. I mean, that was what Katakis said. One final point, I know I'm over on the stalking. The government, I think, I mean, they're making it clear that this is just a generalized statute that if you, and this, here's an example. This is what they say violates the statute, apparently. I'm a very powerful political figure. I issue two social media posts, which our political figures tend to do a lot these days. I say that a particular congressperson has committed treason for conducting a completely lawful investigation, and that that particular congressperson should be punished, potentially with life in prison for treason. That particular congressperson is certainly going to have been intimidated, is certainly going to feel emotional distress. It was that political figure's intent to cause that type of emotional stress, to intimidate and to harass. But under the government's view, that's a violation of this statute. Two social media posts with an intent to cause that type of distress is a violation of the statute, and that just can't be. That cannot be what the statute means. It's not a free-floating statute to police the internet. It's a stalking statute. Of course, we might be able to take judicial notice of the fact that politicians never suffer emotional distress. But if I was a politician and someone was telling me I committed treason for conducting a completely lawful investigation, I'd be distressed. Thank you, counsel. You've exceeded your time. Thank you to both counsel for your helpful arguments in this case. Presiding Judge, before we go to the next one, and perhaps I misheard this when you went over the submitted cases, I don't remember hearing you refer to Sabana v. CoreLogic. If I missed that, I'm sorry, but that one has also been submitted. Did you mention that one? I thought that was on our Friday calendar. It was, but it got switched. Oh, that's when it got switched to Thursday. Yeah, it didn't get switched to today. Oh, it did? It's not on today's calendar. In my internal one, I have it for today, but never mind. I know, we did a lot of changes. Okay, I apologize. Yeah, it's not on the docket for today. Very good, okay. All right, thank you. Thank you to both counsel for your helpful arguments. The case just argued is submitted for a decision by the court.
judges: RAWLINSON, SMITH, Rakoff